## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARK TIBBS, #182-979                          *
                                             *
Plaintiff,                                    *
                                             *
v                                             *          Civil Action No.  JKB-13-2340
                                             *
GREGG HERSHBERGER, et al.                      *
                                             *
Defendants.                                   *
                                           ***

### MEMORANDUM

Mark Tibbs is suing defendants Secretary Gary Maynard,[1]former Commissioner J. Michael Stouffer, Deputy Commissioner R. Waters, Executive Director Scott Oakley, Warden Gregg Hershberger, Warden Kathleen Green, Correctional Officer William E. Maycock, and Captain Walter Holmes pursuant to 42 U.S.C. § 1983.[2]  Defendants, by their counsel, have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment with verified exhibits (ECF No. 11) to which Tibbs has filed an opposition and exhibits. (ECF No. 15).[3]

---

[1]   Gary Maynard is the former Secretary of the Department of Public Safety and Correctional Services. The correct spelling and title for defendant R. Waters, Deputy Commissioner is Randall Watson, Director for Programs and Services. J. Michael Stouffer, former Deputy Secretary of Operations of the Maryland Department of Public Safety and Correctional Services, is presently Warden of the Roxbury Correctional Institution. Gregg Hershberger, former Warden of the Roxbury Correctional Institution, is presently the Secretary of the Department of Public Safety and Correctional Services. Kathleen Green is Warden at Eastern Correctional Institution. Tibbs identifies William Maycock  as  Security Chief at Eastern Correctional Institution ("ECI"). Captain Holmes works at  ECI. (ECF No. 1).

[2] Service was not obtained on defendant Lt. Dickens, a correctional officer at Roxbury Correctional Institution. Tibbs alleges Lt. Dickens informed him that his Security Threat Group ("STG") gang member designation would be removed.   For reasons discussed herein, the outcome of this case would not have been different had service been obtained on Lt. Dickens. *See infra*, pp. 11-20.

[3] Tibbs's Motion to Compel  release of his medical records (ECF No. 16) will be denied because the Motion fails to state reasons why the records are needed  and this case does not raise issues concerning medical treatment.  Tibbs's Motion for Appointment of Counsel (ECF No. 17) will be denied because the transfer of Tibbs's "jail house lawyer," a fellow inmate, presents no special or compelling circumstances to warrant appointment.  Moreover, Tibbs has adequately articulated his claims and they are not unduly complex. Tibbs's Motion  to Serve (ECF No. 18) will be denied as moot for reasons stated above. *See supra* n. 3.

The case is ripe for disposition. After considering the pleadings, exhibits, and applicable law, the court now rules pursuant to Local Rule 105.6 (D. Md. 2014), as a hearing is deemed unnecessary. For reasons to follow, defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 11) will be GRANTED.

## PLAINTIFF'S ALLEGATIONS

The court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 378 (2007); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and liberally construes plaintiff's pleadings in light of the fact that he is self-represented. *See Gordon v. Leek*, 574 F.2d 1147, 1151 (4th Cir. 1978).

Tibbs is a self-represented Maryland inmate who is presently incarcerated at Eastern Correctional Institution ("ECI") in Westover, Maryland.  He is suing defendants in their official and individual capacities for violating his rights under the First, Fifth, Eighth, and Fourteenth Amendments. *Id.*  Tibbs alleges he was wrongfully labeled as a gang or Special Threat Group ("STG") member and, as a result, was denied a prison job at ECI,[4] faced potential harm from other inmates, and denied equal protection of the law. (ECF 1).[5] He claims the STG label adversely affected his "basic activities, job assignments, job participation, parole, and progression through the Division [of Correction] to lesser security."

---

[4] *See* ECF No. 15, Ex. 1 p. 18-23.

[5] Defendants stated that on July 25, 2001,Tibbs had a parole hearing at which no reference was made to any gang affiliation. (Ex. 4). It is unclear to this court whether the date of the parole hearing should read July 25, 2011. *See* ECF 11, memorandum p. 2 (referring to parole date as July 25, 2001 and July 25, 2011).  If the parole hearing was held in 2001,  it was presumably prior to Tibbs's STG designation. *See* infra p. 5 (indicating STG designation assigned in 2002). (ECF No. 15, p. 11). Notably, apart from generally stating the gang member designation has an impact on parole decisions, Tibbs does not provide facts to suggest that his parole was actually adversely affected by the STG designation.

(ECF No. 1, p. 8).  Tibbs claims:

> When [he] was given the false label, he was not allowed to work anywhere in the
> jail, to earn money for basic necessities such as for soap, toothpaste, and life
> essentials. After investigation, validated gang members were treated much better,
> allowing known STG members to work in dietary, and participate in jobs like
> dietary, which net special project credits, while giving them access to machinery,
> tools, knives, and items readily able to be turned into weapons. This amounted to
> discrimination and violation in equal protection of the law.

*Id*. Tibbs posits that beginning on November 10, 2010, he made numerous requests to have  a

"false gang label" removed, and the designation created an "atypical hardship" for him. (ECF

No. 1, p. 2 and 4). Additionally, Tibbs presents the following claims: prison officials tampered

with his mail; he was denied access to the courts; and the practices of the Inmate Grievance

Office are unfair. (ECF No. 1). As redress, he requests $1 million compensatory damages,

$1 million punitive damages and injunctive relief to include, but not limited to, "[a] finding no

checks and balances exist in the Department of Public Safety and Correctional Services" and

"[t]ransparent rules and regulations need to created [sic] which adhere to constitutional rights,

while simultaneously advocating penological interests and safety." *Id*.

## FACTS

### A.  Security Threat Group Designation

From August 10, 2006, to July 8, 2011, Tibbs was an inmate at Roxbury Correctional

Institution ("RCI"). (Ex. 1). [6] On July 8, 2011, he was transferred to ECI.

On March 15, 2011, Tibbs, then housed at RCI, filed administrative remedy procedure

(ARP) request RCI-0198011, complaining that he had been falsely labeled a Security Threat

Group (STG) gang member and asked that his name be removed from the STG list. (Ex. 2).

---

[6] All  exhibits referenced were filed by defendant and are docketed at ECF 11. All references to page numbers in
record citations are to those generated by the court's electronic case filing system unless otherwise indicated.

Lieutenant Jason McCollough investigated the complaint and signed the response to the ARP on

April 21, 2011, as the warden's designee. (Ex. 2 and 3).  The ARP response read:

> Your request for Administrative Remedy has been investigated and has been **DISMISSED.**  Your complaint is you are labeled as a STG and you are not. Currently you are validated as an STG. The removal of the STG status may be done through a lengthy STG renunciation process that is started through the Intel office.  The Intel office will investigate and if found you are a candidate for the process the Intel office will contact you.

(Ex. 2, p. 2). [7]

Tibbs claims that he filed a timely appeal of the ARP dismissal and wrote to Scott

Oakley, Director of the Inmate Grievance Office ("IGO"), on July 16, 2011, because his appeal

to the Commissioner was not answered. (ECF No. 1, p. 7).[8]  Tibbs states that on July 22, 2011,

he received a letter from the IGO directing him to send missing paperwork within thirty days.

Tibbs asserts that he had already sent the information "in the earlier appeal." (ECF 1, Compl.,

p. 3).[9]  On August 19, 2011, the IGO appeal was denied as without merit. (ECF 1, Compl.,

p. 3).[10]

On May 15, 2013, the ARP coordinator at ECI received ARP ECI 0985-13, in which

Tibbs reiterated that he was not an STG member.  He complained that he had never been

interviewed at RCI or ECI concerning an STG affiliation. (Ex. 5, p. 2).  Further, he disputed

---

[7]  Tibbs observes that he was not notified in 2002 of the designation, provided reasons why he was flagged, or why the validation was updated in 2007. ECF No. 15, p. 5.   "Without the opportunity to contest or challenge presumptions, conjecture or supposition, the plight of the inmate is left to the unfettered discretion of staff."  *Id*. p. 6.

[8]  Tibbs's reference to the May 22, 2011, date appears to be in error. (ECF No. 1, p. 7, ¶ f).  The ARP was dismissed on April 21, 2011. (Ex. 2 and 3; *see supra* p. 2).

[9]  In his Reply, Tibbs states he explained to the IGO that he had been recently transferred from RCI to ECI and had to "get rid of a lot of my paperwork because of space requirements. The paperwork I had clearly demonstrated the extent that I had been trying to have the false label removed from my name." (ECF No. 15, Ex. 1, p. 30).

[10]  Copies of these records were not provided to the court.

information that he had been "caught with security tools while assigned to Maintenance at RCI."
*Id*.[11]  He asked that his STG designation be removed. *Id.*

The ARP investigation was conducted by Lt. Edward Blake who found that Tibbs was
validated as an STG member on October 3, 2002, and that validation was updated March 7,
2007. (Ex. 5, p. 1, Ex. 6, p. 2 ¶ 4).  As part of the ARP investigation, Tibbs's property was
searched on June 4, 2013, and no STG paperwork or paraphernalia was found to indicate he was
involved in STG activities. (Ex. 6, p. 2 ¶ 4).

On June 28, 2013, Lt. Edward Blake interviewed Tibbs and both signed a request to
remove Tibbs's 09 designation (STG designation). (*See id. see also* Ex. 7). The response
dismissed the ARP and reads:

> Your request for administrative remedy has been investigated and is hereby
> Dismissed; upon review of supporting documentation, it has been determined that
> there is no evidence to substantiate your claim that you have been unjustly
> validated as a member of an STG.  Documentation shows you were validated on
> 10/3/02 and your validation was updated on 3/7/07. However, a review of your
> Intel file and a search of your property was conducted on 6/3/13 and no STG
> paperwork or paraphernalia was found to indicate you are still involved in STG
> activities.  A request will be made to the Intelligence Unit to have the validation
> removed.

(Ex. 5, p. 1).

On August 19, 2013, the Headquarters Intelligence Unit removed the 09 designation
from Tibbs's file. (Ex. 8, p. 2 ¶ 5).

Blake attests further in his declaration:

> The 09 designation is a code used in the OBSCIS [Offender Based State
> Corrections Information System] electronic record system to designate that an
> inmate is flagged as a member of a STG. The 02 OBSCIS offender function
> maintain alerts data does not have a 09 designation for Tibbs. The 09 designation
> in OBSCIS has been removed as to Tibbs.

---

[11]  On February 21, 2010, tools were discovered in Tibbs's cell at RCI. (Ex. 11, p. 10).  Subsequently, a hearing
officer found Tibbs not guilty of violating Rule 116 (possession of tools) because his cellmate took full
responsibility for the violation. (Ex. 11, p. 13).

(Ex. 6, p. 2 ¶ 6). Blake also attests that defendants Holmes and Maycock are not assigned to the Intelligence Office at ECI that conducts the investigation as to the 09 designation. As such, neither would have been responsible for removing the 09 designation. *Id.*

John Fountain, Assistant Chief of the Headquarters Intelligence Unit of the Department of Public Safety and Correctional Services, attests, too, that the 09 designation has been removed from Tibbs's file and there is no 09 code for Tibbs shown on OBSCIS. (Ex. 8, p. 2 ¶¶ 5 and 6). Additionally, the intelligence database,[12] which is accessible only to intelligence staff, lists his status as inactive. (Ex. 8, p. 2 ¶ 6).

Fountain explains that in cases where an inmate disputes an STG designation the initial investigation is conducted by the institutional intelligence lieutenant or his designee at the facility where the inmate is housed. (Ex. 8). If the investigating officer and the warden or the warden's designee agree that the inmate should no longer be validated as an STG, a request to remove the inmate from the STG list (09) and justification for the removal is sent to the Intel Unit at Headquarters. An investigative review is conducted by the HQ Intelligence Unit. *Id.* If Headquarters agrees, the inmate's name is removed from the STG list. *Id.* Defendants Maynard, Stouffer, Watson, Hershberger, and Green "do not personally handle a STG designation investigation and renunciation process. They rely on corrections staff to conduct" the process and remove the designation if so required. (Ex. 8, p. 2 ¶ 3).

Additionally, Fountain attests that "[t]he STG validation policy and procedure is security sensitive and confidential; therefore, not all steps of the investigation are provided to inmates or to the general staff. Providing this information to inmates and the general staff would severely

---

[12] Defendants refer to this database as the "Intelligence AGI database" (Defs. Supp. Mem. 4), but provide no explanation of the term "AGI." *See* note 19, *infra*.

compromise the process and thwart efforts to investigate, identify, and validate STG members."
(Ex. 8, p. 2 ¶ 4).

On August 27, 2013, Randall Watson sent a letter to Warden Green finding the
Headquarters appeal of ARP ECI-0985-13 was meritorious and directed that measures be taken
to provide the relief Tibbs requested within thirty days.  (Ex. 5, p. 5). On September 5, 2013,
Warden Green notified Watson that the STG flag had been removed, thus, providing the relief
ordered in Appeal ECI-0985-13 and requested by Tibbs.

### B.  Inmate Grievance Office

Scott Oakley, Director of the Inmate Grievance Office ("IGO"), states his office has
record of two grievances referenced by Tibbs in his Complaint.  (Ex. 9).  The first, IGO No.
20111030 was filed on May 16, 2011, as an appeal from the disposition of ARP-RCI-0198-11, in
which Tibbs complained that his efforts to have his "name removed from the list as a STG
member" proved fruitless. This grievance was administratively dismissed by IGO Deputy
Director Robin Woolford on August 19, 2011, for failure to state a claim upon which
administrative relief could or should be granted. This final administrative decision was affirmed
by the Circuit Court for Somerset County (Long, J.) on February 16, 2012, *In Matter of Tibbs*,
Case No. 19-C-11-015014. *Id.*[13]  The second was IGO No. 20122507 and was filed by Tibbs on
December 5, 2012, as an "appeal" from the disposition of ARP ECI-1882-12, in which he
complained that his labeling as an STG member caused him to be denied attendance at an ECI
"Sports Fest" event, in violation of assurances made by then-DOC Commissioner J. Michael
Stouffer in a letter to Congressman Elijah Cummings, dated November 14, 2008. This grievance

---

[13]   Tibbs has provided a copy of the Circuit Court order that grants the State's Motion for Disposition without a
hearing. (ECF No. 15, Ex. 1, p. 26).  No copy of either the Circuit Court's findings or the parties' submissions was
filed in this court to consider defendants' assertion that Tibbs's claims are precluded under the doctrine of *res
judicata*. (ECF No. 11 n. 3).  Thus, that argument is not addressed.

was administratively dismissed on March 5, 2013, for failure to state a claim upon which administrative relief could be granted. This final administrative decision was subsequently affirmed by the Circuit Court for Somerset County (Long, J.) on July 22, 2013, *In Matter of Tibbs*, Case No. 19-C-13-015973. (Ex 9).[14]

### C.  Job Assignments

ECI policy provides that inmates who are validated active STG members are reviewed on a case-by-case basis for job assignment due to security concerns in accordance with institutional directive ECI.ID.100.0001.1. (Ex. 6).  Upon his transfer to ECI on July 08, 2011, Tibbs was assigned to orientation job assignment status until August 04, 2011, at which time Tibbs was assigned to Job Bank/ Sanitation. (Ex. 11).

Case Management case plan notes dated April 6, 2012, show that Tibbs was not offered a job in the dietary department due to medical reasons. *Id*.  After he was cleared by the medical department, Tibbs was maintained on Job Bank/ Sanitation. *Id*.  Subsequently, he was denied a transfer from the Job Bank/Sanitation to Skilled General Maintenance. *Id*. The case management notes read that in 2010 tools were found in Tibbs's cell at RCI, although they  do not indicate he was found not guilty of a rule violation because Tibbs's cellmate accepted full responsibility for the rule violation. (Ex. 11, p. 9 and 13).

### D.  Mail

Legal mail at ECI is opened in the presence of the recipient inmate.  Only the contents of the envelope are issued to the inmate. The envelope and any packing or labeling material or filler are not given to the inmate in order to curtail efforts to smuggle contraband through legal mail. (Ex. 11, p. 3). In cases where information is needed from the envelope, the inmate may write the

---

[14]  Clearly, Tibbs has diligently pursued his claims. Defendants do not seek their dismissal for lack of administrative exhaustion.

information on a separate sheet of paper. *Id*. On October 22, 2012, Directive ECI.ID.250.0001.1 was updated to state: "Staff will issue a copy of the envelope to the inmate upon request." (Ex. 11, p. 1 and 7).

Pursuant to DCD 250.0001, which is related to ECI.ID250.0001.1, outgoing mail may be opened and searched when warranted. *Id*. Pursuant to ECI.ID.250.0001.1.03 Policy(5), inmate mail, both incoming and outgoing, may be opened and inspected for contraband. *Id*. Mail is read, censored, or rejected based on legitimate institutional interests of order and security. *Id*. When a mail cover is requested, outgoing mail is opened pursuant to the request. *Id*. ECI records reflect that a mail cover was not requested for Tibbs. *Id*.  Warden Green does not personally handle the processing of any inmate mailing. (Ex. 11, p. 2).

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is a test of the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  To pass this test, a complaint need only present enough factual content to render its claims "plausible on [their] face" and enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plaintiff may not, however, rely on naked assertions, speculation, or legal conclusions. *Bell Atl. v. Twombly*, 550 U.S. 544, 556–57 (2007). In assessing the merits of a motion to dismiss, the court must take all well-pled factual allegations in the complaint as true and construe them in the light most favorable to the Plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). If after viewing the complaint in this light the court cannot infer more than "the mere possibility of misconduct," then the motion should be granted and the complaint dismissed. *Iqbal*, 556 U.S. at 679.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id*. at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

Because Tibbs is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat v. Baltimore Ravens,* 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex*, 477 U.S. at 323–24)).

## DISCUSSION

Defendants seek dismissal of Tibbs's complaint by asserting he has failed to state a claim, his claims for injunctive relief are moot, they are protected by sovereign immunity, and respondeat superior does not apply. Further, defendants assert they are entitled to summary judgment as a matter of law.

Plaintiff's substantive claim is analyzed under the holding in *Paine v. Baker*, 595 F.2d 197, 201 (4th Cir. 1979).  In *Paine,* the United States Court of Appeals for the Fourth Circuit held that in certain circumstances a claim of constitutional magnitude is raised where a prisoner alleges (1) that information is in his file; (2) that the information is false; and (3) that it is relied on to a constitutionally significant degree.[15]  *Id.*, 595 F.2d at 201.  Assuming arguendo that Tibbs brought his concerns to the attention of the proper prison officials, he has failed to allege reliance to a constitutionally significant degree on this information.

### A.  Due Process

"[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano,* 427 U.S. 215, 224 (1976).[16]  In the prison context, there are two types of constitutionally protected liberty interests that may be created by government action. The first

---

[15] The requirement of reliance to a constitutionally significant degree has two dimensions.  First, the court must examine the nature of the adverse administrative decision made on the basis of erroneous information, *i.e.*, whether it impacts on a colorable liberty interest.  Second, the Court must review the nature of the false information.  If the error is more significant than technical and, for example, involves the inmate's past criminal record or his record of disciplinary offenses while in prison, then it may not reasonably be relied on and fundamental fairness requires its removal or deletion.  *Paine v. Baker*, 595 F.2d at 203.

[16]  Tibbs bring his due process claims under both the Fifth and Fourteenth Amendments. All defendants are state actors. Thus, it is unclear why Tibbs cites to the Fifth Amendment. *See e.g. San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 542 (1987) (stating the Due Process Clause of the Fifth Amendment applies only to federal actors).  *See supra*, p 1.

type of liberty interest involves a state created entitlement to early release from incarceration. *See Board of Pardons v. Allen*, 482 U.S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state-created liberty interest in good conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Tibbs claims the STG label subjected him to atypical hardship and unconstitutional conditions of confinement. Specifically, Tibbs avers the STG label adversely affected "basic activities, job assignments, job participation, parole, and progression through the Division [of Correction] to lesser security." (ECF No. 1, p. 8). Additionally, he claims his life was endangered and "unreasonable risks of serious damage were posed to his future health, even though damage has not yet occurred." (ECF No. 1, pp. 8-9). Additionally, he claims defendants "inhibit his recreation and exercise." (ECF No. 1, p. 5). Notably, Tibbs concedes he has suffered no physical harm as a result of Defendants' alleged conduct. *Id.*

### 1. Job Assignment

"[P]rison work assignments are matters within the discretion of prison officials, and denial of employment does not, in and of itself, abridge any constitutional right of the inmate." *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978); *see also Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir. 1980). Because inmates have no independent constitutional right to a prison job, prison officials may generally terminate an inmate from his job for any reason without offending federal due process principles. An inmate's expectation of keeping a specific prison job, or any job, does not implicate a protected property interest. *See Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995); *Coakley v. Murphy*, 884 F.2d 1218, 1221 (9th Cir. 1989)

(holding that inmates have no protected property interest in continuing in work-release program); *Flittie v. Solem*, 827 F.2d 276, 279 (8th Cir.1987) (indicating inmates have no constitutional right to be assigned to a particular job); *Ingram v. Papalia*, 804 F.2d 595, 596 (10th Cir. 1986) (stating the Constitution does not create a property interest in prison employment); *Gibson v. McEvers*, 631 F.2d at 98 (stating a prisoner's expectation of keeping prison job does not amount to a property interest subject to due process protection); *Bryan v. Werner*, 516 F.2d 233, 240 (3d Cir. 1975) (reasoning that inmate's expectation of keeping job is not a property interest subject to due process protection).  In the absence of a colorable liberty interest in acquiring or maintaining a prison job, Tibbs has no constitutional right implicated and there is no genuine issue of fact presented.  Accordingly, Defendants are entitled to summary judgment as a matter of law.

### 2.  Parole

The Constitution does not create a protected liberty interest in the expectation of early release on parole. *See Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); *see also Jago v. Van Curen*, 454 U.S. 14, 18 (1981) (mutually explicit understanding that inmate would be paroled does not create liberty interest).  Without a protected liberty interest in parole, a prisoner typically cannot mount a challenge against a state parole review procedure on procedural or substantive due process grounds. *See Johnson v. Rodriguez*, 110 F.3d 299, 308 (5th Cir. 1997).  In this case, Tibbs's general reference to his parole lacks any allegation of specific harm. In the absence of any allegation of constitutional injury, no cognizable claim is presented, and summary judgment will be entered in favor of defendants.

### 3.  Security Classification

A prisoner has no constitutional right to a particular custody or security classification, *see Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (noting that prisoners have no constitutionally protected interest in prison classifications or rehabilitative programs), and no constitutional right to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution. *See Olim v. Wakinekona,* 461 U.S. 238, 245-46 (1983); *see also Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) ("The federal constitution itself vests no liberty interest in inmates in retaining or receiving any particular security or custody status '[a]s long as the [challenged] conditions or degree of confinement ... is within the sentence imposed ... and is not otherwise violative of the Constitution.'" (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). Further, federal courts are required to accord great consideration to a correctional system's need to maintain order, discipline, and control. *See Sandin*, 515 U.S. at 483–84 ("federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment").

To the extent Tibbs may complain that he was not able to earn good-time credits, he has not set forth a liberty interest protected by the due process clause. The inability to earn credits does not implicate a liberty interest that arises directly under the Constitution. *See Meachum v. Fano*, 427 U.S. at 225–26; *Wolff v. McDonnell*, 418 U.S. at 557.  Although prisoners are afforded due process protections when the loss of actual, earned, good-time credits are at issue, *Wolff*, 418 U.S. 539, the Supreme Court has afforded no such rights when merely the opportunity to earn such credit is at issue.

### 4.  Conditions of Confinement

Tibbs's claim of prospective endangerment is unsubstantiated and, by his own account, unrealized.[17] He does not identify any specific threats or injuries resulting from the STG designation. His claim of limited exercise and recreation are without factual predicate and, in any event, do not allege harm or injury. Consequently, summary judgment will be granted in favor of Defendants.

### B.  Equal Protection

 "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  Tibbs claims that validated gang members were treated much better than he, and were allowed work in jobs like dietary, which net special project credits, and this amounted to discrimination and violation in equal protection of the law. (ECF 1, p. 8).  However, Tibbs fails to provide any details to substantiate that he was in fact treated differently from other similarly situated inmates or that this differential treatment implicated a suspect classification or a fundamental right. Prisoners are not a suspect class.  *See Nicholas v. Tucker*, 114 F.3d 17, 20 (2d Cir. 1997).  In the absence of any evidence of purposeful discrimination on this basis, the claim will be dismissed for failure to state a claim upon which relief may be granted.

### C.  Administrative Remedy Process

If Plaintiff is suing Defendants due to dissatisfaction with the ARP process and IGO review, he fails to state a claim of constitutional dimension.  An inmate has no constitutional

---

[17] On October 25, 2013, Tibbs requested a cell change because he did not get along with his cell mate.  Tibbs stated that he had not been threatened or assaulted and was not in fear for his life. (Ex. 10).  His request was denied.  In his reply, Tibbs has submitted his cellmate Douglas Barnes's affidavit in which Barnes attests he has never fought with Tibbs. (ECF No. 15, Ex. 1 p. 28).

right to the establishment of an administrative remedy or other grievance process or to participate in one voluntarily established by the state. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). It follows that no constitutional right emanates from alleged errors or defects in such process. No constitutional right of the plaintiff is implicated by any alleged errors or defects in such a process.[18]

### D. Mail and Access to Court Claims

Next, Tibbs asserts that Defendants have tampered with his mail. He asserts outgoing unprivileged letters have been opened without notice or reason and legal mail was improperly opened. (ECF No. 1 p. 5). Tibbs fails to provide details in support of this claim, including who improperly opened his mail and when this happened.

Inmate claims regarding legal mail are typically analyzed as "access to court" claims under the First Amendment. To state a constitutional claim for denial of access to the courts, a prisoner must show that the alleged shortcomings "hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Prisoners are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977). In *Lewis v. Casey*, the Supreme Court clarified *Bounds* by finding that a deprivation of a prisoner's right of access to the courts is actionable, but only where the prisoner is able to demonstrate actual injury from such deprivation. *Lewis*, 518 U.S. at 349. The actual injury requirement, however, is not satisfied by just any type of frustrated legal claim. *Id*. at 354. Rather, the *Lewis* Court concluded that *Bounds* stood essentially for the proposition that prisoners are not guaranteed the ability to litigate every imaginable claim they can perceive, but instead to have access to the tools necessary "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id*. at 355. Tibbs

---

[18] In light of the above, the court need not reach defendants' affirmative defense of qualified immunity.

does not assert he was hindered from pursuing a legal matter, missed a filing deadline, or otherwise sustained actual injury or specific harm as a result of the actions alleged. Because he alleges no evidence of actual injury, he has failed to state a claim upon which relief may be granted.  Accordingly, this claim will be dismissed.

### E.  Ex Post Facto Law

To the extent Tibbs claims in his Reply that prison internal mail and job placement directives created an *ex post facto* application of law (ECF No. 15, p. 7; ECF 11, Ex. 8 and 11), his claim lacks merit because he does not allege that a legislative or regulatory enactment has altered his punishment. The *Ex Post Facto* Clause "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Weaver v. Graham*, 450 U.S. 24, 30 (1981). In order to make an *ex post facto* claim, Tibbs must show "that the law he challenges operates retroactively ... and that it raises the penalty from whatever the law provided when he acted." *Johnson v. United States*, 529 U.S. 694, 699 (2000); *see also Burnette v. Fahey,* 687 F.3d 171, 184 (4th Cir. 2012) ("To state a claim for a violation of this provision, a plaintiff must plead facts showing the retroactive application of a new rule that 'by its own terms' or through 'practical implementation' creates a 'significant risk' of extending the period of incarceration to which he is subject." (quoting *Garner v. Jones*, 529 U.S. 244, 255 (2000)).  Prison regulations may be subject to "reasonable amendments as necessary for good prison administration, safety[,] and efficiency, without implicating ex post facto concerns." *Ewell v. Murray*, 11 F.3d 482, 485–86 (4th Cir. 1993).

### F.  Injunctive Relief

Article III of the Constitution limits federal judicial power to "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (citations omitted). A

case becomes moot when the issues presented are "no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Where injunctive relief is requested, it is possible for events occurring subsequent to the filing of the complaint to render the matter moot. *See, e.g., Rendelman v. Rouse,* 569 F.3d 182, 186 (4th Cir. 2009) (stating that, "as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.").  In this case, Tibbs was transferred from RCI to ECI before he filed this suit. Further, the STG flag has been removed from the OBSCIS electronic data records system and Tibbs is listed as inactive in intelligence records.[19]   Therefore, Tibbs's request for injunctive relief is moot as to these issues. Consequently, these claims will be dismissed.

### G. Sovereign Immunity

The Eleventh Amendment bars suit in federal court, in the absence of consent, against a state by its own citizens. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001).  While the State of Maryland has waived its sovereign immunity for certain types of cases brought in State courts, *see* Md. State Gov't Code Ann., § 12–202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court.  The Eleventh Amendment also bars suits against a state official in his official capacity where, as here, the suit is essentially to recover money from the state.  In such cases, state officials may invoke Eleventh Amendment immunity because the state is the real party in interest.

State officials and employees sued in their official capacities are immune from suit for damages brought under 42 U.S.C. § 1983.  *See Ballenger v. Owens*, 352 F.3d 842, 844-45 (4th

---

[19]  Defendants provide no description of the "AGI system." Tibbs argues he has not been provided the relief he seeks because removal renders the STG label "inactive."  He does not dispute however, that his designation is no longer shown as active on intelligence lists and the 09 label has in fact been removed.  *See supra*, pp. 5-6.

Cir. 2003) (suits against state officials in their respective official capacities are treated as suits against the state itself). As previously noted, Tibbs is suing each defendant in his or her official capacity as well as individual capacity; thus, the claims against them in their official capacities must be dismissed.

### H. Respondeat Superior

` Tibbs provides no evidence that defendants were personally involved in assigning the STG label to him, investigating his complaints concerning the label, interfering with his mail, or otherwise acting to abridge his constitutional rights. As previously noted, Warden Green does not personally handle inmate mail processing. *See supra* p. 8. Defendants Holmes and Maycock are not assigned to the Intelligence Office at ECI that conducts investigations concerning STG designations, and neither would have been responsible for removing the designation. *See supra* p. 5. Defendants Maynard, Stouffer, Watson, Hershberger, and Green "do not personally handle a STG designation investigation and renunciation process. They rely on corrections staff to conduct" the process and remove the designation if so required. *Supra* p. 6.

Vicarious liability based on respondeat superior is generally inapplicable to § 1983 actions. *See Vinnedge v. Gibbs*, 550 F.2d 926, 927–99 (4th Cir. 1977); *see also Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 691 (1978). Supervisory liability is "determined 'by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference

to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799 (internal quotation marks omitted).  When the facts are viewed in the light most favorable to Tibbs, it is clear no genuine issue of material fact is presented, and defendants are entitled to summary judgment in their favor.

## CONCLUSION

For these reasons, the court will grant Defendants' Motion to Dismiss or in the Alternative for Summary Judgment.  A separate Order consistent with this Memorandum follows.

DATED this 8th day of August, 2014.

BY THE COURT:

_____/s/_____

James K. Bredar
United States District Judge